Yazoo & Mississippi Valley R. R. Co. *v.* William
Fletcher.

[56 South. 667.]

1. Punitive Damages. *Evidence. Question for jury. Excessive damages.*

In a suit by an engineer for injury in a collision between trains,
evidence that the engineer in charge of the train committing
the injury knew the rules of the company; that he was required
to be on the siding at the point of collision at least five
minutes before the train on which plaintiff was engineer, arrived; that he had a time table and a watch; that he did not
send any flagman down in front of his train; that he was a
new engineer and was doubtful as to whether or not he could
make the siding in time for the other train, is sufficient to
warrant the court in submitting to the jury the question of the
infliction of punitive damages.

2. Excessive Damages.

*Held,* that twelve thousand dollars was not an excessive recovery
for injury to a locomotive engineer in a collision, resulting
from the gross negligence of an engineer on another train the
damages consisting of severe injuries to the head, back and
hip.

Appeal from the circuit court of Bolivar county.
Hon. Sam C. Cook, Judge.

Suit by William Fletcher against the Yazoo & Miss.
Valley R. R. Co. From a judgment for plaintiff, defendant appeals.

The appellee, who was plaintiff in the court below,
brought an action for fifty thousand dollars damages for
injuries sustained by him in a head-on collision between
a passenger train and freight train on the line of the defendant's railroad; the appellee, an engineer of the appellant, having been in service eighteen years—three
years as fireman and fifteen years as engineer. On the
day of the accident he was in charge of the north-bound

passenger train on his regular run, which he had had
for some time. He was entirely familiar with his run
and schedule, and his train, being of the first class, had
right of way over all other trains of the same class and
of inferior classes. His train was due to arrive at the
station of Burdette at 7:42 a. m., and arrived on time on
the day of the accident. At about 7:25 a. m., of the same
day a south-bound mixed freight and passenger train,
carrying a circus, pulled out of the station of Leland,
running toward Burdette, a distance of 4.1 miles. The
engineer on this circus train was a man named Ryan, who
was on his first run, having previously been employed
about the yards on switch engines. The proof shows
that he knew the schedule, and knew that the north-bound
train was due at Burdette at 7:42. It is shown that he
looked at his watch, and having some doubt about mak-
ing Burdette in time to take the siding, which left the
main line about four hundred feet north of the station
at Burdette, he asked the conductor if he thought he
could make it. It seems that the circus people were hur-
rying the conductor, so that they might arrive as early
as possible at their destination, below Burdette, where
they were to give a performance that day. The conduc-
tor and engineer then decided to make the run. It is
shown by the record that they had to stop at the South-
ern Railway crossing at Leland, and make another stop
at the switch north of Burdette, and that each stop con-
sumed about five minutes, as it took from two to three
minutes to stop and as long to get under way again. The
rules of the railroad company required freight trains
to clear at a siding not less than ten minutes prior to the
time of arrival of a passenger train. The morning was
very foggy, and the undisputed testimony shows that
neither engineer could see a great distance ahead of
him.

The circus train proceeded south, and as it approached
Burdette the engineer put a brakeman out on the pilot

to look out for the switch, as the fog had obscured the switch staff. The switch was not seen in time, however, either by the engineer or by the brakeman. The engineer testified that the first knowledge that he had of arriving at the switch was the noise of the engine going over the frog. He immediately put on his emergency brakes, and slowed down his train to something like six miles an hour, in order to back his train and pull out on the siding. Before he could stop, the north-bound passenger train was upon him. The appellee, who was in charge of the north-bound passenger train, testified that he did not see the south-bound circus train until he was within thirty yards of it, and that he hardly had time to reverse his engine and jump before the collision. He was caught in the wreckage, and knocked unconscious, receiving injuries in the head, side, back, and leg. He brought suit, and the court permitted the jury to consider, not only the compensatory damages, but punitive damages, in making up their verdict. The jury returned a verdict for plaintiff for twelve thousand dollars, and from a judgment for that amount this appeal is taken.

*F. A. Montgomery, Chas. N. Burch* and *Mayes & Longstreet,* for appellant.

We insist that there could be no case of gross negligence in this, and certainly no case warranting the finding of the verdict for punitive damages in this case, because the testimony is undisputed, to-wit, the testimony of the engineer and the flagman both, that there was ample time to clear the main line before the arrival of the passenger train, and that the cause of the collision was that this engineer in the exercise of the utmost degree of caution, simply was unable to see the switch target and passed it in the fog.

"Punitive damages," "vindictive damages," and "exemplary damages," are synonymous terms.

The kind of wrongs to which exemplary damages are applicable are those which, besides the violation of a

right, or the actual damages sustained, import insult, fraud, or oppression, and are not merely injuries, but injuries inflicted in the spirit of wanton disregard. 13 Cyc., pages 105 to 110 inclusive, and the very full notes thereto with cases cited; especially see the language used in paragraph C, on page 110, as follows:

"Where the negligence is accidental or no wantonness or circumstances of malice enter into the wrong, there can be no recovery of exemplary damages." See, also, the case of *Vicksburg R. R.; P. and M. Co.* v. *Marlett,* 78 Miss. 873, wherein Judge Terrell speaking for the court, says:

"That punitive damages may be recovered only in cases where the acts complained of are characterized by malice, fraud, oppression, or willful wrong evincing a disregard of the rights of others." Also: *R. R. Co.* v. *Moore,* 79 Miss. 776; *Strom* v. *Green,* 51 Miss. 103; *Whitfield* v. *Whitfield,* 40 Miss. 352; *Briscoe v. McElwinn,* 43 Miss. 557; *Jamison* v. *Moon,* 43 Miss. 598; *Chicago R. R. Co.* v. *Scurr,* 59 Miss. 456; *R. R. Co.* v. *Pearson,* 80 Miss. 26; *R. R. Co.* v. *Smith,* 82 Miss. 656; *Railway Co.* v. *Lanning,* 83 Miss. 161; *R. R. Co.* v. *Mitchell,* 83 Miss. 179; *R. R. Co.* v. *Christmas,* 89 Miss. 686; *R. R. Co.* v. *Jarrett,* 59 Miss. 470; *R. R. Co.* v. *Gill,* 66 Miss. 39; *R. R. Co.* v. *Fite,* 67 Miss. 373; *R. R. Co.* v. *Farsee,* 63 Miss. 66.

We especially insist that under these authorities the rule is well established in Mississippi that punitive damages cannot be allowed unless the servants of the railroad company have been guilty of a willful wrong or of negligence so gross that it is equivalent to a willful wrong.

*Sillers, Owen* and *Sillers,* for appellee.

We take it that the authorities cited by the counsel for their defense do not restrict the rule for the recovery of punitive damages to only those cases that are "characterized by malice, fraud, oppression or willful

wrong, evincing a disregard for the rights of others."
We take the rule to be, not only in Mississippi, but the
general rule that "punitive damages are not prohibited
where there has been some intentional wrong or insult,
or, in the absence of these, negligence so gross as to
evince a reckless disregard of the consequence." *R. R.
Co.* v. *Sceer,* 59 Miss. 556; *R. R. Co.* v. *Jarrett,* 59 Miss.
470; *Wilson* v. *R. R. Co.,* — Miss. —; *R. R. Co.* v. *Gill,*
66 Miss. 39; *R. R. Co.* v. *Scanlon,* 63 Miss. 413; *R. R. Co.*
v. *Fight,* 67 Miss. 373; *R. R. Co.* v. *Fosee,* 63 Miss. —.
And we take the rule followed by our court, that "if the
act of the defendant is shown by the proof to have been
wanton, or negligence so gross as to evince a reckless
disregard for the rights of plaintiff or others," that pu-
nitive damages may be recovered.

If the act of the servants was either willful wanton-
ness, or such gross negligence as would seem to be wan-
tonness then the plaintiff could recover.

In order to establish wantonness, it is not necessary
to establish an entire want of care, wantonness being the
failure of a duty which it is a duty to exercise an honest
effort in the employment of all means available to pre-
vent injury. *Birmingham Railway & Electric Co.* v.
*Pinkard,* 124 Ala. 372. A failure to use means to avoid
peril together with indifference as to the consequences
may be construed by the conduct, although no intent ex-
ists to cause an injury. *Birmingham Ry. & Elec. Co.* v.
*Pinkhard,* 124 Ala. 372.

In order that one may be held guilty of willful or
wanton conduct, it must be shown that he was conscious
of his conduct, and conscious from his knowledge of the
existing conditions that injury would likely or probably
result from his conduct, and of his reckless indifference
to consequences, he consciously or intentionally does
some wrongful act, or omitted doing some duty which
produced that result. *Mont. Street Ry. Co.* v. *Rice,* 144
Ala. 610.

By willful neglect it is meant such conduct as evinces reckless indifference to the safety of the public, or is an intentional failure to perform a plain and manifest duty, in the performance of which the public and the party injured had an interest. *S. Griggs, Ex.* v. *Cincinnati, Etc. Ry.,* 89 Ky. 367.

Whitfield, C.

The court was entirely right in submitting the question of punitive damages to the jury. The evidence showed overwhelmingly gross and wanton recklessness on the part of the appellant. It was of no sort of consequence that the show people wanted to hurry up the conductor. The evidence shows plainly that the engineer knew the rules of the company; that he was required to be on the siding at Burdette at least five minutes before the north-bound passenger arrived at 7:42 a. m.; that he had a time-table and a watch; that he did not send any flagman down in front of the train; and that he himself was so much in doubt, when he started, as to whether he had time to make the siding, that he asked the conductor what he thought about it, and that he was a new engineer, who had seen very little service. Indeed, it is useless to fill this opinion with the testimony in the case. It is quite enough to say that the testimony overwhelmingly shows the result to be a righteous one.

On the testimony in the record, we cannot say that the verdict is at all excessive.    *Affirmed.*

Per Curiam. The above opinion is adopted as the opinion of the court, and for the reasons therein indicated the judgment is affirmed.